UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                                          CASE NO. 11-11518

BOURBON SALOON, INCORPORATED,                      SECTION "B"
D/B/A MANGO MANGO AND OLD
ABSINTHE HOUSE, F/K/A CONTI
MANAGEMENT GROUP, INC., F/K/A
DANTE'S ON DECATUR, INC., F/K/A
NEWPORT CORPORATION OF
LOUISIANA

               DEBTOR                                                            CHAPTER 11

## MEMORANDUM OPINION

This matter came before the court on March 26-27, 2013 on the motion of the debtor, Bourbon Saloon, Inc. ("BSI" or the "debtor"), to assume a lease of nonresidential real property pursuant to 11 U.S.C. § 365(a) and 11 U.S.C. § 365(d)(4) **(P-107)**, the opposition thereto filed by the lessor, The Absinthe Bar, L.L.C. ("A-Bar") **(P-115)**, the motion for lease rejection at 400 Bourbon Street filed by A-Bar **(P-497)**, and the objection thereto filed by the debtor **(P-551)**. The controversy centers on the non-monetary defaults on the debtor's maintenance duties at the leased property. BSI asks the court to recognize its assumption of this lease and to find that the defaults are cured. A-Bar contends that the lease was never assumed, claims that the non-monetary defaults are not cured, and seeks termination or dissolution of this long term lease. For the reasons set forth below, the court finds that the debtor has assumed the lease, and that the debtor has made significant enough progress towards curing its non-monetary defaults under the lease that A-Bar may not terminate the lease. As a part of the cure the court finds that the debtor also owes attorney's fees and costs to A-Bar.

1

**Background Facts**

    **A. The History Between the Parties**

The debtor holds a pre-petition lease of 400 Bourbon Street that was signed on July 24, 1997 for a term of twenty years which is set to expire on October 31, 2017, with an option for the debtor to renew for another twenty years to October 31, 2037.[1] On May 12, 2011 the debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, at which time the debtor was in default under the lease.[2] With respect to the monthly rental payment, the debtor has since cured all monetary defaults which existed at the time of filing of the petition and is timely paying rent. The debtor was at the time of filing in default on certain of its non-monetary obligations to maintain and repair 400 Bourbon Street. Because the parties did not agree as to the scope, cost, or allocation of financial responsibility for further work to cure the maintenance and repair defaults, the court approved the hiring of Danny Shaw (the "Referee") to determine the disputed issues of required scope of work, payment responsibility, and adequacy of performance of the work.[3]

On March 26, 2012, the debtor's Amended Chapter 11 Plan of Reorganization was confirmed.[4] A-Bar had agreed to continue the Motion to Assume and the parties included language in the debtor's plan to allow A-Bar's objections to the debtor's motion to assume to

---

[1] Trial Exhibit 3.
[2] By the time the debtor filed its Chapter 11 petition, it had been in default as to the repair and maintenance provisions of the lease for several years. Much of the damage to the building dates back to Hurricane Katrina in 2005. A-Bar first began attempting to evict the debtor for its failure to make repairs in an action filed in state court on May 12, 2010. There were many attempts at settlement and mediation, much of which is detailed in the amended pre-trial order filed by the parties (P-567), culminating in the instant motions before the court.
[3] (P-295). The court authorized the debtor to enter into an agreement to mediate the Motion to Assume and A-Bar's objection to that motion. Upon recommendation of the mediator, the parties agreed that instead of incurring the costs and expenses of a formal evidentiary hearing, an attorney with expertise in construction matters who is also a licensed professional engineer, would be appointed to act as referee in determining the extent of the repairs necessary and which party was responsible for the repairs. *See also* (P-298). Order dated January 13, 2012 granting the application to employ Shaw as Referee.
[4] (P-411).

survive confirmation.[5] The parties entered into an agreement as to the terms of the lease assumption, and on May 15, 2012, the court signed the Agreed Order on Motion to Assume Lease (the "Agreed Order") that was drafted by the parties.[6] The Agreed Order declares the following with regard to the lease: 1) that the reorganized debtor's assumption of the lease of the premises at 400 Bourbon is approved and A-Bar is provided with adequate assurance of cure as required by section 365 of the Bankruptcy Code; 2) the debtor will immediately commence work on those undisputed maintenance defaults listed in the Consent Judgment, the Vieux Carre Commission citations and the City of New Orleans Department of Safety and Permits citation, and any other citations extant;[7] 3) that, when a maintenance item is determined, whether by the consent of the parties or decision by the Referee, to be for the debtor's account, the debtor shall pay the resulting contractor obligations as provided in the construction contract and in no event shall any liens be permitted to be filed against the property; 4) that all maintenance and repair defaults must be cured and work completed on or before December 31, 2012; and 5) this court shall maintain jurisdiction to review decisions by the Referee and to enforce the terms of the Agreed Order.[8]

After the December 31, 2012 deadline set forth in the Agreed Order for completing repairs to the building had passed, and the debtor had still not completed all of the work it had

---

[5] (P-357).
[6] (P-449).
[7] Trial Exhibit 39. The Consent Judgment was entered into by the parties in the course of the state court litigation that preceded the bankruptcy filing. It was signed by the state court judge on August 19, 2010 and obligated the debtor to make all repairs to the building specified by David K. Rester, Esq. and Farr & Huston Architects, and all repairs required by the Vieux Carre Commission, at the debtor's expense, in a good workmanlike manner, and in accordance with applicable building code standards. The Vieux Carre Commission final notice, which was Trial Exhibit 45, obligated the debtor to remedy numerous violations in accordance with Chapter 166 of the 1995 Code of the City of New Orleans. Trial Transcript of March 26, 2013 at p. 77. The New Orleans Safety and Permits violation was not entered into evidence as an exhibit. As of the date of the hearing, March 26-27, 2013, A-Bar stipulated that the City of New Orleans Safety and Permits violations were cured; these violations are separate from the VCC violations.
[8] (P-449).

agreed to do, A-Bar filed a motion with the court asking it to reject the lease.[9] On January 24, 2013, the court issued an order setting a hearing for March 25 and 26, 2013,[10] on the motion for lease rejection and the debtor's objection thereto, and the motion to assume and the objection to that and narrowed the issues to: 1) whether the lease was assumed by the debtor by the consent order dated May 15, 2012 with the conditions set forth in the order reflecting whether the failure to provide the necessary maintenance and cure of the assumed lease is a resolutory condition giving rise to a breach of contract; or 2) whether the maintenance and cure conditions in the consent order were conditions precedent to the assumption of the lease giving rise to a rejection of the lease.[11]  In this order the court attempted to narrow the issues for hearing further by ordering that: 1) the debtor complete by February 28, 2013 any and all maintenance and cure remaining due; 2) no later than February 22, 2013, the Referee shall be furnished with all work orders, inspections, reports, or other materials that he might need in order to complete his report as to the state of the property and the maintenance and cure of the lease; 3) the Referee shall file a written report with the court no later than March 8, 2013; and 4) no later than March 8, 2013 the parties shall complete any and all discovery deemed necessary by them to present their respective cases to the court.

Pursuant to the court's January 24, 2013 order, the Referee filed his report and found that the Debtor "has substantially performed those items previously found to be its responsibility, with the exception of the following items:…. 1) exterior masonry; 2) windows; 3) men's closet

---

[9] (P-497) filed January 16, 2013. The next day, A-Bar also filed a Motion to Set Final Hearing on Lease Assumption (P-499). In the motion to set final hearing A-Bar asked not only for a hearing on its motion to reject, but also for a hearing on the debtor's already agreed upon motion to assume. A-Bar asked for an expedited hearing and the court set the matter for hearing on February 7, 2013. The debtor then filed a motion to vacate the order setting the expedited hearing and asked for an expedited hearing on that. After a phone conference with the parties, the court entered the January 24, 2013 order setting the hearing on the motion to reject and mistakenly setting the hearing on the motion to assume for the same day (which had already been resolved by the Agreed Order).
[10] The hearing was later moved back one day by the consent of the parties.
[11] (P-512).

4

on first floor; 4) condenser platform in courtyard; and 5) structural engineer certifications of structural integrity of various building elements and repair efforts."[12]  A-Bar contends that the debtor failed to show that the Referee's report was erroneous and failed to prove the debtor had complied with the terms of the Agreed Order.[13]  A-Bar further alleges that a substantial portion of the repairs remains incomplete or inadequately performed therefore A-Bar should be freed from the lease.  The debtor argues that it had substantially completed most of the work by the December 31, 2012 deadline and that at trial it proved that as of the date of the trial, all terms of the Agreed Order had been satisfied and that it had cured all of the nonmonetary defaults under the lease.[14]

### B. The Referee's Report

The parties did agree to have the Referee determine any disputed issues as to the required scope of work.[15]  Thus, even though the court is not bound by the Referee's findings, the court takes the Referee's report of March 7, 2012 as its starting point for its discussion of the adequacy of the debtor's attempts to cure the nonmonetary defaults under the lease.  The court notes as a preface to its discussion of the specific problems with the building at 400 Bourbon Street that the building is a very old building in the New Orleans French Quarter.[16]  As is common with these old buildings, multiple problems abound, requiring maintenance often under the watchful eye of the VCC.  These problems may well have been exacerbated by the debtor's delay in fulfilling its

---

[12]  Referee Determinations No. 2; Trial Exhibit 118 at pp. 4-6.  A sixth item in the Referee's report concerned a letter dated April 4, 2012 sent by the City of New Orleans Department of Safety and Permits.  As mentioned *supra* in footnote 7, A-Bar stipulated at trial that this item was no longer an issue, so the court need not address it in this opinion.  This letter is in no way connected to the Vieux Carre Commission violations; the VCC is a separate entity from the Department of Safety and Permits.
[13]  A-Bar cites no authority supporting its argument that the debtor has the burden of showing the Referee's report was erroneous.  Indeed, even though the Referee's assistance in detailing the scope of the work was invaluable, the decision as to whether the cure efforts of the debtor were sufficient is within the descretion of the court.
[14]  (P-577).
[15]  See Agreed Order dated May 15, 2012 and Ex Parte Joint Application to Employ Professional (P-295) at ¶ 3.
[16]  Walter Zehner, a structural engineer who testified as an expert for the debtor, opined that the building was probably built before the Civil War.  Trial transcript of March 26, 2013 at p. 166.

5

repair obligations, but the fact is that these old buildings often have problems that are time consuming, expensive and difficult to fix. The Referee's report concluded that the repairs had been adequately performed with the exception of six areas detailed in the report.[17] The Referee's last inspection was February 18, 2013 and his last written report was issued on March 7, 2013. The debtor continued to make repairs after that date.[18]

> **1. The leak in the men's bathroom on the first floor and the condenser platform in the courtyard.**

The Referee's report states:

Although the cause was not determined, water accumulated in the closet to the Men's bathroom on the first floor has been and remains a chronic problem. Bourbon Saloon should have investigated the cause of the accumulated water and eliminated that cause. The problem remains.[19]

Additionally, the report states: "The wooden platform upon which air conditioning condensers or towers sit is completely deteriorated and required replacement. Bourbon Saloon has committed to that replacement."[20]

At trial James Buras, the debtor's general contractor, testified that he had in fact replaced the condenser platform after the Referee's last inspection.[21] A-Bar does not contest that the platform was replaced, but argues that did not correct the problem.[22] The evidence showed that there was a suspicion that the leak was caused by the condensers on the platform and that by replacing the condenser platform, the leak would also be fixed. The debtor's controller, Gregory Bonstaff, and the debtor's structural engineer, Walter Zehner, III, both testified at trial to the

---

[17] Trial Exhibit 118, the Referee's report.
[18] Gregory Bonstaff, the debtor's controller, testified that after the Referee's report, masonry work had been completed, the contractor had gone back in to repair the leak in the closet, and the condenser platform had been replaced. He also testified that he was holding $30 – $40,000 in case more work was needed. Trial transcript of March 26, 2013 at pp. 47-50.
[19] Trial Exhibit 118 at p. 5.
[20] *Id.*
[21] Trial transcript of March 26, 2013 at pp. 215-16 and 220-21.
[22] A-Bar did express concerns about the adequacy of the design in its post-trial brief.

effect that the leak in the bathroom had been fixed.[23] A-Bar contends in its brief that the bathroom is still leaking, however, and that this problem has still not been fixed, but the only evidence put before the court at the trial was that this problem was fixed.[24]

### 2. The windows

The Referee's report has the following to say about this exception:

Several windows remain incomplete, unfinished, or otherwise improperly aligned/installed. All active window elements should be operable. All window elements should be made to work. All windows should be made to close completely without gaps between adjoining elements. All non-glass window elements should be finished, properly painted, and otherwise protected. They are not.

At the trial Buras testified that he had installed 37 new windows and that subsequent to receiving the Referee's report, the remaining problems with the windows had been fixed.[25] He stated that all of the window elements work, that there are no more gaps between the windows and adjoining elements and that they had been properly painted and finished. Zehner, the structural engineer, also testified that he had examined the windows on February 18, 2013 and that at that time they did not appear to be allowing water to enter the building.[26] A-Bar argues that the testimony of Tony Lamartz, a person who worked on the windows after the Referee conducted his inspection, suggests that not very much was done to the windows after the Referee's final inspection. Lamartz testified that he had only painted and replaced a piece of glass.[27] This is countered, however, by Buras's testimony that he was installing locks and counterweights on the windows the week before the trial.[28] The court finds that the weight of the testimony shows that

---

[23] Trial transcript of March 26, 2013 at p.49; Trial transcript of March 27, 2013 at p. 143.
[24] A-Bar's post-trial brief (P-576) at p. 7. A-Bar attempted to submit an affidavit affixed to its post-trial brief to show that the leak was still not fixed. The debtor objected to the court's admission of that affidavit, and the court entered an order striking the affidavit (P-582).
[25] Trial transcript of March 26, 2012 at pp. 200 and 222-24.
[26] Trial transcript of March 26, 2013 at p. 184.
[27] Trial transcript of March 27, 2013 at pp. 9-10.
[28] Trial transcript of March 26, 2013 at pp. 218-19.

7

at the trial date the windows that had been installed and repaired by Buras were water-tight and the work constituted an acceptable cure of this particular defect.[29]

### 3. The masonry

The Referee's report shows real concern as to this exception:

> Perhaps the most significant failure of Bourbon Saloon to perform adequate maintenance and repairs for which is it (sic) responsible regards VCC required repointing/tuck pointing of "Deteriorated brick and masonry (needs repointing badly)." VCC citation dated August 15, 2011.
>
> Proper repointing/tuck pointing requires a reasonable investigative effort and a disciplined and thorough effort to remove dead or loose mortar between masonry units and a proper, workmanlike application of new mortar in those joints.
>
> Bourbon Saloon failed to investigate and locate dead and loose mortar and failed to apply new mortar in joints between bricks in a proper, workmanlike manner. Bourbon Saloon failed to inspect for and remove all dead or loose mortar, and obviously failed to replace the dead or loose mortar that it should have removed. Beyond that, for some of the mortar it did place, <u>the workmanship was aesthetically and functionally improper and unacceptable</u> (emphasis added).

The debtor argues that because the masonry issue arose when it received the Vieux Carre Commission ("VCC") citation of September 1, 2011 the standard to which it should be held for the repairs of the masonry is that which satisfies the VCC. The debtor further argues that it has satisfied the VCC; the debtor presented testimony and submitted a memo from the VCC examiner that specifically states that all masonry repairs appear to be complete as of March 15, 2013, the date of the VCC memo.[30] A-Bar argues that the work is not sufficient because it is not complete or thorough enough and points to the Referee's report as well as testimony from its experts to support this contention.

Much of the testimony and the arguments in the briefs concern this masonry issue. The tuck-pointing may not have been as aesthetically pleasing as A-Bar wished or even,

---

[29] Buras also testified that as of the date of the trial there were no gaps in the windows and that they were water-tight. Trial transcript of March 27, 2013 at pp. 147-49.
[30] Trial exhibit 123. Trial transcript of March 26, 2013 at p.125.

8

"aesthetically and functionally improper and unacceptable" as the Referee noted,[31] but it satisfied the critical eye of the VCC inspector. Buras testified that extensive repointing of the masonry was completed.[32] The court finds that the fact that the work was accepted by the VCC is sufficient to resolve the question of the adequacy of the masonry work.

### 4. Other items

The other excepted items in the report are the structural engineer certification of structural integrity of various building elements and repair efforts and the City of New Orleans' April 4, 2012 letter. The parties agreed that the any issues concerning the City of New Orleans' letter are resolved. At trial, the court was satisfied by the testimony of the structural engineer that he had signed off on the structural integrity of the building and that, although there was some nitpicking by A-Bar over the language used in his report, this condition had been satisfied.[33] The court considers that particular issue settled.

### C. The Lease

The provision of the lease[34] at issue in this litigation states:

> Sublessee [the debtor] shall, throughout the term of this Lease, fully maintain and take good care of the building and other improvements located on the Lease Premises and keep them free from waste or nuisance of any kind. Sublessee agrees at all times and at its sole cost and expense to maintain and keep the demise (sic) premises, including, without limitation, interior nonstructural walls, gutters, electrical, heating and air conditioning systems, plumbing work (inside the Premises), pipes, fixtures, faucets, interior and exterior finishes, windows, doors and all other areas, accessories and appurtenances in good repair and condition and will promptly make all repairs, whether minor or major, necessary during the term hereof at Sublessee's sole

---

[31] See the underlined portion of the Referee's report, *supra*, at p. 8.
[32] Trial transcript of March 26, 2013 at p. 202-07, 212, 213, 226-28.
[33] *See* testimony of Walter F. Zehner, III that the building is structurally sound. Trial transcript of March 26, 2013 at pp. 167-68 and 173.
[34] The court notes that although it has consistently referred to the lease and the parties as the lessor and the lessee, the lease is actually a sublease. Mr. Joseph A. Sinatra is the sublessor under the terms of the sublease and the debtor is the sublessee. After the sublease was entered into Mr. Sinatra purchased 400 Bourbon Street. After purchasing the property, Mr. Sinatra organized The Absinthe Bar, LLC and transferred his ownership of the property to the LLC. *See* (P-115) A-Bar's opposition to the motion to assume at p. 2.

9

cost and expense.  Sublessor [A-Bar] agrees at all times and at its sole cost and expense to maintain and keep the Excluded Area, the roof, structural walls and foundations of the Lease Premises as presently configured in good repair and condition and will promptly make all repairs, whether minor or major, to the roof, structural walls and foundation, necessary during the term hereof at Sublessor's sole cost and expense.  If Sublessee makes any major alterations to the roof, structural walls or foundation, then those changes would become the responsibility of the Sublessee and any repairs thereto would also be Sublessee's responsibility.  This, however, does not apply to Sublessee opening original doorways in the outside walls which should not be considered a major alteration, and which Sublessor hereby approves.  Any damage resulting from the opening of the doorways shall be the responsibility of the Sublessee but in no event shall this relieve Sublessor from his responsibility to maintain the structural walls.  In the event that a repair is necessary which affects the Premises in its appearance or structural soundness, the party who is responsible for the maintenance of that portion of the Lease Premises shall, upon receipt of written notice from the other party ("Noticing Party"), start making those repairs within ten(10) days of receipt of such notice and failure to do so following such written notice or if that party should fail or neglect to prosecute to completion of such repairs with reasonable diligence, the Noticing Party may make such repairs as it deems necessary and any sums paid by the Noticing Party for repairing a portion of the Lease Premises that is to be maintained by the other party shall (i) if it is Sublessor's responsibility, have the rent reduced by the amount and cost of the repairs, or (ii) if it is Sublessee's responsibility, upon receipt of an invoice from the Sublessor of the cost of repairs, this amount shall become additional rent due in the next month's rental payment and shall be considered as rent under the terms of this Lease Agreement.[35]

## I. Legal Analysis

### A. The Lease was Assumed by the Debtor, and its Assumption was Approved by the Agreed Order

The court will first address an argument raised by A-Bar regarding whether the lease was assumed or not.  When A-Bar filed its motion to reject the lease after the debtor failed to meet the December 31, 2012 deadline for making the repairs, the court's order setting a hearing stated in part that the parties should consider whether the lease was assumed by the Agreed Order dated May 15, 2012, or whether the debtor's failure to complete the cure of the nonmonetary defaults

---

[35] Trial Exhibit 3 at pp. 5-6.

under the lease by December 31, 2012 resulted in a failure to assume the lease as well.[36] Upon reflection the court feels that this was confusing.

The court finds that the lease was assumed by the debtor and the assumption was approved by the court in the May 15, 2012 Agreed Order. The order specifically states that the assumption of the lease is approved, and no law or facts are cited by A-Bar to support its argument that the lease was not assumed at that time.[37] Unless the court approves of a different arrangement, a lease is assumed once court approval is obtained.[38] Whether defaults existing at the time the lease was assumed have been or can be cured is a different question and is correctly the only issue before the court.

### B.  The Debtor has Adequately Cured its Nonmonetary Defaults of the Lease

Once the lease assumption is approved the court is then concerned with whether the nonmonetary defaults existing as of the date of the assumption have been cured or can be cured within a reasonable time.  There is no hard and fast rule and the time table set by the parties by agreement or in a court order is subject to the court's discretion as to whether the cure efforts of the debtor – particularly as to non-monetary defaults – are substantial enough to deny A-Bar its sought after relief, cancellation of the long term lease.

---

[36]  Because A-Bar's motion was to reject the lease, the court was initially somewhat confused as to whether the lease had already been assumed or not.  Because the assumption was by consent of the parties and not by court order, the court was unclear as to the intention of the parties when confecting the Agreed Order.  Additionally, as mentioned *supra* in n. 9, A-Bar's motion to set hearing (P-499) requested the court to set the motion to assume for hearing, so initially, the court was under the mistaken impression that the motion to assume was still an outstanding motion.

[37]  The court notes that the holding that the lease was assumed by the Agreed Order works to A-Bar's favor.  The assumption of the lease imposes the obligation to cure the pre-petition default on the debtor and transforms the prepetition default into an obligation of the estate.  As such, any expenses and liabilities incurred by the debtor in its performance of the lease, such as the attorney's fees and costs that A-Bar seeks are administrative expenses.  11 U.S.C. § 503(b)(1)(A).  If the lease had not been assumed and was now rejected, as A-Bar seeks, A-Bar's resulting claim for lease rejection would merely be an unsecured claim, which would not be paid in full.

[38]  *In re Mushroom Transportation Company, Inc.*, 78 B.R. 754, 761 (Bankr.E.D.Pa. 1987).

Much of A-Bar's evidence goes to show the substantial cure of the defaults was not completed by the December 31, 2012 deadline or by the February 28, 2013 deadline contained in the court's order of January 24, 2013. The debtor continued, however, to make repairs after those times, and even if all the repairs were not completed by the date of the Referee's report, the debtor continued to work on the problems and made substantial repairs even after the Referee's last inspection on February 18, 2013 and the Referee's report, issued on March 7, 2013. Also, that the debtor has set aside $30- $40,000 for future repairs demonstrates to the court that whatever failures or delays the debtor may be responsible for in the past, it is now making a good faith effort to comply with the lease obligations concerning the maintenance and repair of the building.

It is true that the parties agreed to December 31, 2012 as the date for the cure to be finished in their Agreed Order. The December 31, 2012 date, though a year and a half after the filing of the bankruptcy, was only six and a half months after the parties agreed upon and the court approved the assumption of the lease. The process for getting permits to perform the required work on a building in the French Quarter is very lengthy, so the debtor's workers were not able to commence working on all of the problems immediately after the Agreed Order had been signed.[39] In light of the fact that the debtor has spent over $300,000 to make repairs and has set aside another $30 - $40,000, the court finds that it is not unreasonable to allow the debtor

---

[39] Trial transcript of March 26, 2013 at pp. 195-201. Buras, the contractor, testified that he submitted his proposal to do the work for the debtor on June 11, 2012, received his notice to proceed in August, and began ordering millwork and windows and other materials at that time. He also testified that the VCC issued a temporary exploratory permit on October 29, 2012 (trial exhibit 84) and a permit to actually do the work was issued on December 4, 2013 (trial exhibits 94 and 95). He testified that he had not thought getting the permits would take such a long time. Those permits and the VCC meeting minutes and papers show that the debtor made its first application for permits in early September 2012, so it took at least three months to get the final permits to do the work. It is therefore not surprising that the VCC did not issue its final approval by December 31, 2012. *See* Trial exhibits 88 and 91.

12

to complete any remaining repairs after that December 31, 2012 date and thereby allow the debtor to complete the plan of reorganization.

The court finds that A-Bar, as the owner of the building, is setting high standards for the repairs it expects the debtor to make under the terms of the lease and adhering to its stringent position that failure to meet that standard gives it the right to dissolve the lease. This is understandable behavior on the part of A-Bar. The building represents an extremely valuable asset, and A-Bar is anxious to realize what it feels is a more realistic rental value of this highly desirable French Quarter property. Underlying this desire to dissolve the lease is the fact that there is at least one third party that would like to lease the premises, presumably for significantly more money than the current monthly rent.[40] If A-Bar is allowed to evict the debtor, it stands to gain substantially. But the effect on the reorganized debtor and the creditors would be a devastating failure of the plan. The court must take notice that the terms of the lease call only for good repair and condition,[41] not the perfection that A-Bar insists upon. The standard for the repairs called for in this case by the VCC are high and it is thus significant that the demands of the VCC have been satisfied by the performance to date of the debtor.

The debtor may have a history of dragging its heels when making repairs, making them poorly, or not making them at all. It may also have made repairs in the past as cheaply as possible that were not anywhere near the standard of quality that A-Bar would like to see. Since filing its Chapter 11 petition, however, the debtor has made extensive repairs and has spent in excess of $300,000 doing so.[42] The lease is essential to the reorganization of the debtor and the

---

[40] The current monthly rent is low considering the current market for property in the area. A-Bar could make significantly more money if it were allowed to terminate the lease and re-lease the property to someone other than the debtor. Supposedly, a person named Moe Boder has offered *the debtor* $1 million to take over the lease. Trial transcript of March 26, 2013 at p. 29-30;
[41] *See* page 9 *supra.*
[42] Trial transcript of March 26, 2013 at p. 50.

court recognizes the difficulty, expense, and time consuming nature of making repairs in old buildings in the French Quarter. The debtor is cautioned to remember however, that the repairs and maintenance are just as much a part of the lease obligation as the monthly rent. The debtor would do well in the future to keep current on its maintenance obligations.

Louisiana Civil Code Article 2014 states: "A contract may not be dissolved when the obligor has rendered a substantial part of the performance and the part not rendered does not substantially impair the interest of the obligee." Additionally, the Louisiana Fourth Circuit Court of Appeals has held that in the context of a suit for the dissolution of a lease, "The trial court has discretion to decline dissolution where it finds that the breach of the lease is not major or where the breach was not the fault of the lessor or where the lessor was in good faith."[43] The court finds that here, the debtor has spent over $300,000 making repairs to the building; it has also performed the work to the satisfaction of the VCC and cleared all outstanding VCC complaints against the building. The debtor has also satisfied the City of New Orleans Safety and Permits violation letter. The court finds this constitutes substantial performance pursuant to La. C.C. Art. 2014. It further finds that A-Bar's primary interest is dissolving the lease. Any other interests of A-Bar are not substantially impaired if the debtor continues to pay the rent and make all repairs called for by the lease.

The court finds that the curative work the debtor has finished, even if not completed within the deadlines imposed by the parties in the Agreed Order, has substantially cured the non-monetary defaults under the lease. To the extent that A-Bar disagrees or new defaults in called for maintenance arise, A-Bar can take advantage of the lease provisions available to it. The terms of the lease clearly state that if the party responsible for making repairs - in this case the

---

[43] *Karno v. Fein,* 846 So.2d 105, 110 (La.App. 4 Cir. 2003); *Karno v. Bourbon Burlesque Club Inc.,* 931 So.2d 1111 (La.App. 4 Cir. 2006).

debtor - does not do so with reasonable diligence, then the other party –in this case A-Bar - is free to make those repairs and invoice the debtor for the costs of doing so.  It would seem that if A-Bar's true interest is in protecting its asset and not just trying to evict the debtor, then perhaps the best course of action for these parties is for A-Bar to complete whatever remaining repairs it claims still exist after the trial and invoice the debtor for the costs.  That way, A-Bar can see that the repairs are made to its standards, and that they are completed in a timely fashion.

### C. Attorney's Fees and Expenses

Section 365(b)(1)(B) of the Bankruptcy Code requires that the debtor compensate the non-debtor "for any actual pecuniary loss resulting from default."  In the instant case, A-Bar incurred damages of attorney's fees and costs for litigation related to the defaults that remained as of the December 31, 2012 cure deadline set forth in the Agreed Order.  Section 365(b)(1)(B) does not create an independent right to an attorney fees award.[44]  But § 365 does recognize a landlord's right to compensation for actual pecuniary losses resulting from debtor's default under an unexpired lease assumption, and attorney fees qualify as "actual pecuniary losses" when state law would recognize them as such.[45]  The lease in the instant case states: "If, on account of any default by the debtor in its obligations under the terms of the Lease, it becomes necessary for the lessor to employ an attorney to enforce or defend any of the lessor's rights or remedies, the debtor agrees to pay reasonable attorney's fees incurred by the lessor with a minimum of Five Hundred and No/100 ($500.00) Dollars."[46]  Thus, under § 365, actual pecuniary losses are due to A-Bar in the form of attorney's fees and costs.

Any damages flowing from the breach of an assumed contract or unexpired lease should be considered first priority administrative expenses under 11 U.S.C. § 503, if the actual and

---

[44] *In re Natl. Gypsum Co.*, 208 F.3d 498 (5th Cir. 2000).
[45] *In re Westview 74th Street Drug Corp.,* 59 B.R. 747 (Bankr. S.D.N.Y. 1986)
[46] Trial Exhibit 3.

15

necessary damages: 1) occur post-petition; and 2) arose as a result of actions taken by the trustee (the debtor in possession in this case) that benefitted the estate.[47] Priority administrative expenses incurred in bankruptcy are paid in full before other unsecured non-priority claims.[48]

In this case, the non-monetary defaults were not cured by the post-petition Agreed Order deadline for cure on December 31, 2012. A-Bar incurred attorney's fees and costs as a result of the post-petition litigation brought after the December 31, 2012 deadline to force the debtor to finish remedying the nonmonetary defaults under the lease that was assumed by the Agreed Order. That satisfies the first element, that the damages occur post-petition, to garner priority administrative expense status under § 503.

As to the second element, that the damages result from an action taken by the trustee (or debtor in possession) to benefit the estate, the debtor elected to assume the lease because the lease is essential to its reorganization. The debtor earns significant money from its operation of the bar, and it would not be able to continue to do so if it had not assumed the lease.[49] The lease assumption was an action taken by the debtor-in-possession that benefitted the estate. Thus, the second element is also satisfied. The court holds that A-Bar's attorney's fees and costs are to be paid as administrative expenses under the debtor's plan of reorganization.

Within fourteen days of the date of this order A-Bar is to file a statement of attorney's fees and costs incurred by it after December 31, 2012. The debtor will have fourteen days to file an objection to A-Bar's statement. The parties should not set this for a hearing; the court will

---

[47] *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001).
[48] 11 U.S.C.A. § 507(a)(1).
[49] The debtor's last monthly operating report prior to confirmation indicates that it had cash receipts for the month of March 2012 of $1,411,434, although it is not clear what portion of this revenue is directly attributable to the business at 400 Bourbon Street. The debtor's disclosure statement represents that the lease at 400 Bourbon Street is one of the debtor's major assets and contributes significantly to the debtor's income. (P-301) First Amended Disclosure Statement at p. 14 and exhibit B-8 to the disclosure statement.

make its decision based on the filings of the parties and schedule a hearing if it feels one is necessary.

### Conclusion

For the reasons set forth in this memorandum opinion, the court finds that the lease was assumed by the Agreed Order dated May 15, 2012. The court finds that the debtor is not currently in default under the lease; it has expended a considerable amount of money and cured most if not all of the non-monetary defaults under the lease. Because it did not do so to A-Bar's standards does not mean that it has not cured the defaults under the lease. The court finds that the attorney's fees and costs that A-Bar incurred after December 31, 2013 shall be paid as administrative expenses by the debtor. A-Bar shall file a statement of these fees and costs into the record within fourteen days of the date of this opinion, and the debtor shall have fourteen days thereafter to file an opposition to that statement. There will be no hearing on the matter of the fees, the court shall consider the matter and issue an order setting the amount of the fees after reviewing the statement and any objection thereto.

New Orleans, Louisiana, October 11, 2013.

_____
Jerry A. Brown
U.S. Bankruptcy Judge